# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

**FILED**
**Dana Wilson, Clerk**
**United States Bankruptcy Court**
**Savannah, Georgia**
***3:26 pm, Jun 04 2025***

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| NELL CADY, | ) |
|  | ) |
| *Debtor*. | ) |
|  | ) |
| PAUL A. SCHOFIELD, Chapter 7 Trustee, | ) |
|  | ) |
| *Movant*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| NELL CADY, | ) |
|  | ) |
| *Respondent*. | ) |

Chapter 7

Number 24-41026-EJC

Contested Matter

## OPINION ON TRUSTEE'S OBJECTION TO EXEMPTIONS

Before the Court is the Objection to Exemptions filed by Paul A. Schofield,

the Chapter 7 Trustee. (Dckt. 23). The Debtor, Nell Cady, owns a 2020 BMW X2,

which she values at $19,573.00. She has claimed three exemptions in the vehicle

1

under Georgia's bankruptcy exemption statute: (1) a $5,000.00 motor vehicle exemption; (2) a $10,517.00 "wildcard" exemption; and (3) a $1,500.00 exemption in the vehicle as a "tool of the trade." The Trustee does not challenge the motor vehicle or wildcard exemptions, but he does oppose the claimed tools-of-the-trade exemption in the BMW. The Debtor, a realtor, contends that the BMW is integral to her occupation and thus qualifies for the tools-of-the-trade exemption.

By separate motion, the Trustee, exercising his authority under 11 U.S.C. § 704(a)(1) to "collect and reduce to money the property of the estate," seeks turnover of the BMW so that he may sell it for the benefit of creditors. If the Trustee sells the vehicle, the Debtor will be entitled to receive proceeds equal to her exempt equity in the vehicle. Whether the BMW is a tool of the Debtor's trade, therefore, will determine the amount of sales proceeds she receives—specifically, whether she is entitled to receive $17,017.00 (if the Court finds that the BMW is a tool of the trade) or only $15,517.00 (if the Court finds that it is not).

## I. Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(B). The Court makes the following findings of fact and conclusions of

2

law under Rule 52 of the Federal Rules of Civil Procedure, made applicable to this matter by Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II. **Findings of Fact**

The facts in this case are undisputed. The Debtor filed a Chapter 7 petition on December 3, 2024. (Dckt. 1). In her Schedule I, the Debtor disclosed that she is a real estate agent employed by Six Bricks Realty in Savannah, Georgia. (Dckt. 1, p. 40, ¶ 1). She reported her combined monthly income at $4,354.00 and stated that her "future income will fluctuate with market conditions[.]" (Dckt. 1, p. 41, ¶¶ 12-13). According to her schedules, her assets total $23,146.14, she has a single secured debt in the amount of $355.80, and her unsecured debts total $899,677.56, comprising $16,139.71 in priority unsecured debt and $883,537.85 in general unsecured debt. (Dckt. 1, p. 15, ¶ 63; dckt. 1, p. 18; ¶ 2.1; dckt. 1, p. 37, ¶ 6). The claims register reflects $22,943.27 in unsecured claims.

In her Schedule A/B, the Debtor listed as her primary asset a 2020 BMW X2, which she valued at $19,573.00. (Dckt. 1, p. 10, ¶ 3.1). She added a notation that the vehicle was "paid for by a family member." (Dckt. 1, p. 10, ¶ 3.1). Per her Schedule D, the vehicle is unencumbered by any liens. (Dckt. 1, p. 18). In Schedule C, she claimed $17,017.00 in her equity in the BMW as exempt under three separate

3

provisions of the Georgia bankruptcy exemption statute, O.C.G.A. § 44-13-100(a). First, she claimed a $5,000.00 motor vehicle exemption under O.C.G.A. § 44-13-100(a)(3). Second, she claimed a $10,517.00 exemption under the "wildcard" provision of O.C.G.A. § 44-13-100(a)(6).[1] And third, she claimed a $1,500.00 exemption under O.C.G.A. § 44-13-100(a)(7), which permits a debtor to exempt up to that amount in "any implements, professional books, or tools of the trade[.]" O.C.G.A. § 44-13-100(a)(7). (Dckt. 1, p. 16, ¶ 2).

On March 3, 2025, the Chapter 7 Trustee notified the Court of possible assets to be recovered and liquidated for the benefit of unsecured creditors. (Dckt. 18). The next day, at the Trustee's request, the Clerk set a June 4, 2025 deadline for filing proofs of claims. (Dckt. 19). Two weeks later, on March 18, 2025, the Debtor received her discharge. (Dckt. 21).

On April 2, 2025, the Chapter 7 Trustee objected to the Debtor's claimed exemptions. (Dckt. 23). The Trustee challenges neither the Debtor's O.C.G.A. § 44-13-100(a)(3) motor vehicle exemption nor the O.C.G.A. § 44-13-100(a)(6) wildcard exemption. (Dckt. 23, p. 1, n. 2). But he does challenge the O.C.G.A. § 44-13-100(a)(7) tools-of-the-trade exemption. According to the Trustee, "the Debtor, as a

---

[1] The wildcard exemption allows a debtor to exempt her "aggregate interest, not to exceed $1,200.00 in value plus any unused amount of the [homestead] exemption, not to exceed $10,000.00, . . . in any property[.]" O.C.G.A. § 44-13-100(a)(6). Here, the Debtor does not own real property and thus has not claimed a homestead exemption.

4

real estate agent, cannot claim the tool-of-the-trade exemption for the [v]ehicle merely because she may sometimes use it for travel to different properties on behalf of clients." (Dckt. 23, p. 1). Because "the 'essence' of the Debtor's occupation is not travel," contends the Trustee, "she cannot claim the [v]ehicle [as] a tool of her trade for the purposes of [O.C.G.A.] § 44-13-100(a)(7)." (Dckt. 23, p. 2).

On April 11, 2025, the Debtor responded to the Trustee's objection. (Dckt. 26). In her response, she argues that traveling to different properties *is* the essence of her work as a realtor because she "is in the business of selling houses [that] are affixed to real property and therefore by necessity she must take prospective clients to the houses in her vehicle." (Dckt. 26, p. 2, ¶ 7). The Debtor also notes that she has two nondischargeable priority debts, one to her ex-husband in the amount of $29,000.00 and the other to the Georgia Department of Revenue in the amount of $9,461.92.[2] (Dckt. 26, pp. 1-2, ¶¶ 3-5). She claims that she "already has or intends to establish repayment plans" with both of those creditors. (Dckt. 26, p. 3, ¶ 10). In her view, her fresh start would be impaired if the Court were to allow the Trustee to sell her BMW and distribute nonexempt proceeds to creditors "who will otherwise allow her to pay the same debt over an extended period of time." (Dckt. 26, pp. 3-4, ¶ 10).

---

[2] The Trustee has since objected to both claims as lacking sufficient documentation. (Dckt. 38, 39).

This matter came on for hearing on April 15, 2025. (Dckt. 24). At that hearing, the Court heard oral argument from counsel and took testimony from the Debtor. Two exhibits were admitted into evidence.[3] According to the Debtor, she has been a licensed real estate agent since December 2016. (Tr., p. 8).[4] In 2024, she worked for Keller Williams Coastal Area Partners from January through October, and during that time she received only two sales commissions, in the amounts of $4,074.75 and $13,824.00. (Tr., pp. 9-10; Ex. "T-1"). In October 2024, the Debtor left Keller Williams and joined Six Bricks Realty. (Tr., pp. 9, 12). At Six Bricks, she received three commissions from October through December 2024, in the amounts of $1,475.00, $3,400.00, and $4,303.00. (Tr., p. 13-14; Ex. "T-2"). In total, then, she made commissions on only five closings in 2024. (Tr., p. 15). The Debtor attributed her failure to make more commissions on a cooling housing market and on her brief attempt to work an office job. (Tr., pp. 15-16).

When asked how many times she visited the five properties sold in 2024, the Debtor answered "[u]nbelievable amounts" and noted that she made "several trips[.]" (Tr., p. 11). She testified that she uses her vehicle for tasks such as "showing the house, doing the inspection, opening for the appraiser, doing the walkthrough[,]

---

[3] Those exhibits were statements from Keller Williams Coastal Area Partners (ex. "T-1") and from Six Bricks Realty (ex. "T-2") showing the Debtor's 2024 commissions.

[4] A transcript of the hearing appears on the docket. (Dckt. 31).

and . . . going to closing[.]" (Tr., p. 18). Sometimes she meets clients at the houses, and sometimes she drives them there. (Tr., p. 17). She frequently shows houses that don't close. (Tr., p. 15). In her view, her car is her office, and she cannot do her job without it, especially since some houses are in rural areas outside Savannah. (Tr., p. 16). But she acknowledged that she does some work, including writing contracts, from home. (Tr., p. 18).

At the hearing, the Trustee disputed the Debtor's $19,573.00 valuation of the BMW, alleging that it is actually worth $28,648.00, but that dispute is not currently before the Court. (Tr., pp. 4, 21-22). Regardless of how the Court rules on this matter, the Trustee intends to sell the vehicle and distribute the proceeds to unsecured creditors. (Tr. p. 21). At stake in this dispute, then, is how much the Debtor would receive—the amount of her exempt equity in the vehicle—from the sales proceeds.[5] At the conclusion of the hearing, the Court took the matter under advisement. (Tr., p. 21).

Three days after the hearing, on April 18, 2025, the Trustee moved for turnover of certain assets, including the BMW.[6] (Dckt. 28). In that motion, the Trustee asserts that the BMW is worth $28,648.00, and thus "there exists at least

---

[5] Alternatively, the Debtor might attempt to keep the vehicle by paying the Trustee the amount of her non-exempt equity in it. (Tr. at pp. 21-22).

[6] The other assets at issue comprise a $500.00 Goyard bag, and three real estate commissions earned by the Debtor pre-petition but not paid until post-petition. (Dckt. 28; Tr., pp. 5-6).

$10,266.20 in non-exempt equity" in the vehicle. (Dckt. 28, p. 2, ¶ 6). In a response filed on May 14, 2025, the Debtor asserts that her $19,573.00 valuation was based on an estimate provided by the Kelley Blue Book's website, and that a certified vehicle appraiser has since valued the BMW at $16,000.00. (Dckt. 37, p. 2). The motion for turnover is scheduled for hearing on June 10, 2025. (Dckt. 33).

## III. <u>Conclusions of Law</u>

This case requires the Court to determine whether a Georgia debtor may exempt a motor vehicle as a tool of the trade under O.C.G.A. § 44-13-100(a)(7). Georgia bankruptcy courts are split on that question. Some hold that a motor vehicle can never be a tool of the trade. In *Curry v. Dial Fin. Corp. (Matter of Curry)*, 18 B.R. 358 (Bankr. N.D. Ga. 1982) (Kahn, J.), the court, citing Supreme Court of Georgia precedent discussed below, found that the Georgia exemption statute "contemplates that the [debtor] uses the tool with his hands, and that the [debtor's] work requires some degree of manual skill." *Id.* at 359. Thus, the debtor, a tile setter, was not permitted to exempt his pickup truck as a tool of the trade.[7] *Id.* at 360. The Court has found one other Georgia bankruptcy decision adopting *Curry*'s rule. *Conerton v. Wachovia Bank (In re Conerton)*, No. 03–62155, 2004 WL 5846767, at

---

[7] That said, the court in *Curry* noted in passing that "[t]he tools used by the debtor in his work as a tile setter might well be classified as tools of the trade for bankruptcy purposes." *Curry*, 18 B.R. at 359.

*1 (Bankr. N.D. Ga. Jan. 13, 2004) (Bihary, J.) ("The Court is persuaded by . . . the reasoning by Judge Kahn" in *Curry*).

Other courts, however, hold that a motor vehicle can be a tool of the trade—at least in some circumstances. In *Schneider v. Fidelity Nat'l Bank (In re Schneider)*, 37 B.R. 747 (Bankr. N.D. Ga. 1984) (Norton, J.), for example, the court rejected *Curry*'s focus on "the intention of the legislators" and instead purported to pay "more attention to a literal reading of the statute[.]"[8] *Id.* at 750. Under its reading, the court allowed a traveling salesman to exempt his 1979 Peugeot because travel was the essence of his occupation. *Schneider*, 37 B.R. at 751. *See also Mitchell v. First Franklin Fin. Corp. (In re Mitchell)*, No. 17–68428–PMB, 2018 WL 1442256, at *2 (Bankr. N.D. Ga. March 21, 2018) (Baisier, J.); *South Atl. Prod. Credit Assoc. v. Jones (In re Jones)*, 87 B.R. 738, 742 (Bankr. M.D. Ga. 1988) (Laney, J.).[9]

Notably, these courts do *not* hold that motor vehicles are always exemptible as tools of the trade. In their view, "it is insufficient to show that the vehicle is essential for traveling to work, even if the motor vehicle is the debtor's sole means of commuting." *Mitchell*, 2018 WL 1442256, at *2. "Rather, a vehicle is properly classified as a tool of trade where the debtor can show that her occupation . . . is

---

[8] The statute in question was 11 U.S.C. § 522(f), as discussed below.

[9] *See also In re Matthews*, 449 B.R. 833, 836-37 (Bankr. M.D. Ga. 2011) (Smith, J.) (permitting husband to exempt tractor as a tool of the farming trade but denying wife's claimed exemption in tractor because she did not personally farm).

9

uniquely dependent on [the vehicle's] use." *Id.* (quotations omitted). Thus, in *Mitchell*, a debtor who worked as a law clerk and tutor was denied the exemption because her work did not uniquely depend on her use of the vehicle. *Id.* at *3. *See also Schneider*, 37 B.R. at 70 (explaining that the motor vehicle must be "integral" to the debtor's trade).

Here, the Debtor testified at length about the necessity of driving to and from houses, and the Court accepts her argument that her occupation as a real estate agent is uniquely dependent on her use of a motor vehicle. Thus, if the Court finds that Georgia law *ever* allows debtor to exempt a motor vehicle as a tool of the trade, then the Court would have no trouble permitting this Debtor to do so. The question is whether Georgia law so allows. The Court, therefore, must decide whether to follow *Curry* (forbidding the exemption) or *Schneider* (permitting it in some circumstances). And that decision requires the Court to explore the statutory text and history of Georgia's tools-of-the-trade exemption.

## A. Bankruptcy Exemptions Protect a Debtor's Fresh Start

"One of the 'main purpose[s]' of the federal bankruptcy system is 'to aid the unfortunate debtor by giving him a fresh start in life[.]'" *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 715 (2018) (quoting *Stellwagen v. Clum*, 245 U.S. 605, 617 (1918)). To that end, the Bankruptcy Code permits a debtor to exempt

10

certain property, as of the petition date,[10] from the claims of creditors. "[E]xemptions in bankruptcy cases are part and parcel of the fundamental bankruptcy concept of a 'fresh start.'" *Schwab v. Reilly*, 560 U.S. 770, 791 (2010).

For that reason, courts construe exemptions liberally in favor of debtors. *McFarland v. Wallace (In re McFarland)*, 790 F.3d 1182, 1186 (11th Cir. 2015). The Bankruptcy Code makes a debtor's claimed exemptions presumptively valid unless a party in interest objects. 11 U.S.C. § 522(l). Under Bankruptcy Rule 4003(c), the party objecting to a debtor's claimed exemptions "has the burden of proving that the exemptions are not properly claimed." Fed. R. Bankr. P. 4003(c). The objecting party must make that showing by a preponderance of the evidence. *McFarland*, 790 F.3d at 1186. Here, that burden falls on the Trustee.

Section 522(b)(1) of the Bankruptcy Code provides that "an individual debtor may exempt from property of the estate the property listed in" § 522(b)(2). 11 U.S.C. § 522(b)(1). In turn, § 522(b)(2) defines exemptible property as "property that is specified" in § 522(d), which lists categories of property that a debtor may claim as exempt, "unless the State law that is applicable to the debtor . . . specifically does not so authorize." 11 U.S.C. § 522(b)(2). In other words, States may opt out of the federal exemption scheme. *McFarland*, 790 F.3d at 1185. The State of Georgia has

---

[10] *See Yerian v. Webber (In re Yerian)*, 927 F.3d 1223, 1229 (11th Cir. 2019) ("It is settled law that a 'claim of exemption is to be determined as of the petition date.'").

opted out, prohibiting "an individual debtor whose domicile is in Georgia . . . from applying or utilizing 11 U.S.C. Section 522(d) in connection with exempting property from his or her estate[.]" O.C.G.A. § 44-13-100(b). Instead, Georgia debtors must use the Georgia exemptions codified at O.C.G.A. § 44-13-100(a). The parties agree that the Debtor in this case may claim exemptions only under the Georgia exemption statute.

## B. A Georgia Debtor May Exempt Tools of the Trade under O.C.G.A. § 44-13-100(a)(7)

Georgia's exemption statute allows three exemptions pertinent to this case. First, and least important, the wildcard exemption allows a debtor to exempt her "aggregate interest, not to exceed $1,200.00 in value plus any unused amount of the [homestead] exemption, not to exceed $10,000.00, . . . in any property[.]" O.C.G.A. 44-13-100(a)(6). Second, and more important to the Courts analysis, the statute permits a debtor to exempt "[t]he debtor's interest, not to exceed the total of $5,000.00 in value, in all motor vehicles[.]" O.C.G.A. § 44-13-100(a)(3). And third, the provision under which this dispute arises, the statute permits a debtor to exempt "[t]he debtor's aggregate interest, not to exceed $1,500.00 in value, in any implements, professional books, or tools of the trade of the debtor or the trade of a dependent of the debtor[.]" O.C.G.A. § 44-13-100(a)(7). As mentioned, the Trustee

does not challenge the Debtor's entitlement to the wildcard and motor vehicle exemptions; the sole issue in this case is whether a motor vehicle falls under the definition of "tools of the trade" for purposes of the O.C.G.A. § 44-13-100(a)(7) exemption.

The term "tools of the trade" is nowhere defined in the Georgia exemption statute. *Mitchell*, 2018 WL 1442256, at *2 ("In drafting § 44–13–100, the Georgia legislature failed to define the phrase 'tools of the trade.'"). "As a result, it has been left to the courts to construe the phrase 'tools of the trade' and to define its outer boundaries." *Id.*

To determine the meaning of "tools of the trade," the Court begins, as it must, with the statutory text. *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023) ("[W]e start where we always do: with the text of the statute."). When terms in a statute are undefined, they must be given their ordinary meaning. *Lamar, Archer & Cofrin*, 584 U.S. at 715. Here, the ordinary meaning of the terms "tool" and "trade" are not especially helpful.[11] Merriam-Webster defines "tool" as, among other things, "a handheld device that aids in accomplishing a task" or "something (such as an instrument or apparatus) used in performing an operation or necessary in the practice

---

[11] To be sure, some courts interpreting the phrase "tools of the trade" in § 522(f)—a provision discussed below—find that "[t]he common usage of the phrase . . . does not ordinarily include motor vehicles." *Steele v. United Nat'l Bank, Sioux falls, South Dakota (In re Steele)*, 8 B.R. 94, 95 (Bankr. D.S.D. 1980). *See also Bank of Edgar v. Nowak (In re Nowak)*, 48 B.R. 290, 291 (W.D. Wis. 1984) ("This Court . . . believes that its imagination will not allow it to envision a 1980 Oldsmobile Cutlass as being anything other than a motor vehicle.").

of a vocation or profession[.]" MERRIAM-WEBSTER DICTIONARY (online ed. 2025). The first definition, requiring that the device be handheld, would exclude an automobile, yet the second would seemingly include it.

So too for the word "trade," which can be either "an occupation requiring manual or mechanical skill" or "the business or work in which one engages regularly[.]" *Id.*[12] A realtor would arguably fall outside the former definition but within the latter. As with "tool," then, to privilege one definition over the other would be to decide this case's outcome arbitrarily. The Court is mindful that "common words typically have more than one meaning," so courts "must use the context in which a given word appears to determine its . . . most likely sense." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 418 (2012).

Other principles of statutory interpretation provide some help in interpreting the phrase. For example, under the associated-words canon (also referred to by the Latin phrase *noscitur a sociis*—"it is known by its associates"), "words grouped in a list should be given related meanings." *Id.* at 195. Here, the O.C.G.A. § 44-13-100(a)(7) exemption applies to "implements, professional books, [and] tools of the trade[.]" The word "implement" does not provide much guidance, as its dictionary

---

[12] *See also Matter of Weinbrenner*, 53 B.R. 571, 577 (Bankr. W.D. Wis. 1985) ("The plain meaning of 'trade' [for purposes of § 522(d)(6)] is 'an occupation, especially one requiring skilled labor.'").

definition—"a device used in the performance of a task"—is broad. MERRIAM-WEBSTER DICTIONARY (online ed. 2025). But the inclusion of "professional books" lends some weight, however slight, to the notion that a tool of the trade must be a small, handheld device.

Likewise, under the whole-text canon, "the judicial interpreter [must] consider the entire text, in view of its structure and of the physical and logical relation of its many parts." *Reading Law* at 167. In other words, "[t]he entirety" of a statute "provides the context for each of its parts." *Id.* And under the presumption of consistent usage, "a material variation in terms suggests a variation in meaning." *Id.* at 170. Applying these principles here, the Court finds it noteworthy that the Georgia exemption statute has separate exemptions for motor vehicles (O.C.G.A. § 44-13-100(a)(3)) and for tools of the trade (O.C.G.A. § 44-13-100(a)(7)). *Curry*, 18 B.R. at 359 ("A separate provision addresses the exemptions permitted for motor vehicles."). The separate motor vehicle exemption could support an inference that the General Assembly did not intend to allow a debtor to exempt a motor vehicle as a tool of the trade.[13] Bolstering that inference is the relatively low amount of the tools-of-the-trade exemption: as most recently amended in 2017, the Georgia exemption statute allows a debtor to exempt up to $5,000.00 in a motor vehicle but only up to $1,500.00 in tools of the trade.

---

[13] *But see Schneider*, 37 B.R. at 750 (rejecting such an inference).

Although these features of the exemption statute are *suggestive*—indicating that a motor vehicle falls outside the scope of tools of the trade—they are not dispositive. The Court finds the language of O.C.G.A. § 44-13-100(a)(7) ambiguous as to whether a motor vehicle may qualify for the tools-of-the-trade exemption. To help answer that question, the Court must peer behind the statutory language and consider the history of Georgia's tools-of-the-trade exemption.

C. <u>O.C.G.A. § 44-13-100(a)(7) is Modeled on 11 U.S.C. § 522(d)(6)</u>

The first salient fact about O.C.G.A. § 44-13-100(a)(7)'s history is that it's nearly identical to a federal exemption set forth in the Bankruptcy Code. Section 522(d)(6) provides an exemption, currently in the amount of $3,175.00, in "[t]he debtor's aggregate interest . . . in any implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor." 11 U.S.C. § 522(d)(6). This language differs from O.C.G.A. § 44-13-100(a)(7) only in the amount of the exemption and the placement of a comma after the word "tools."

What's more, the same language appears a second time in § 522. Under § 522(f)(1)(B)(ii), a debtor may avoid a lien to the extent it "impairs an exemption to which the debtor would have been entitled" if the lien is "a nonpossessory, nonpurchase-money security interest in any . . . implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor[.]" 11 U.S.C.

16

§ 522(f)(1)(B)(ii). Thus, bankruptcy cases addressing tools of the trade can arise either in the context of an objection to a debtor's claimed exemptions, as in this case, or in the context of a debtor's motion to avoid a lien on tools of the trade.

The Supreme Court has never interpreted the meaning of "tools of the trade" under either § 522(d)(6) or § 522(f)(1)(B)(ii), but the Seventh Circuit issued an influential decision in 1987. *See Matter of Patterson*, 825 F.2d 1140 (7th Cir. 1987). In *Patterson*, the joint debtors were farmers. They initially filed under Chapter 11 but later converted their case to Chapter 7. After the conversion, the debtors' tractor and 51 cows were liquidated, and they sought to avoid the bank's lien so they could receive additional proceeds from the sale. In their view, the tractors and cows were tools of the trade exemptible under § 522(d)(6), and they also took advantage of the wildcard exemption. Then they turned to § 522(f) to avoid the bank's lien. The bankruptcy judge granted the debtors' motion to avoid the lien, and the district court affirmed except as to the cows, which the district court found were not tools of the trade. *Id.* at 1141.

On appeal, the Seventh Circuit, in a decision authored by Judge Posner, found that neither the tractor nor the cows were tools of the trade, and the court's reasoning is instructive. Rejecting the debtors' argument that tractors and cows are "instrumentalities for turning raw materials . . . into salable products," the court observed that "a businessman's secretary is by the same token a tool of the trade,"

17

and "indeed, all capital and labor inputs are tools in [that] sense[.]" *Id.* at 1146. If the exemption had "so capacious a definition," then it would really encompass "the capital assets of [a debtor's] business, even though it is to those assets that creditors primarily look for repayment" of debts. *Id.*

Moreover, the court found it significant that the federal exemption made "explicit mention of so petty an item as 'professional books,' which rarely (though sometimes) will have a substantial value[.]" *Id.* And, when *Patterson* was decided, the § 522(d)(6) exemption was limited to $750.00, which the court also found worthy of note:

> [I]f, for example, a printing proprietorship goes bankrupt, what sense would it make to allow the owner to exempt $750 from the auction of a million dollar printing press? The purpose of the tools of the trade exemption is to enable an artisan to retain tools of modest value so that he is not forced out of his trade. Although as a matter of semantics farm "implements" could be thought to cover machinery and vehicles as well as hand tools, this would be an incongruous interpretation. There would be no point in allowing a debtor to exempt $750 worth of equipment that might have a market value of many thousands of dollars. He would have to sell it anyway, and probably he could not replace it; certainly he could not continue to *use* it in his trade.

*Id.* (emphasis in original).[14] In the court's view, both the inclusion of professional books and the low dollar amount of the exemption were inconsistent with the debtors' broad interpretation of tools of the trade.

But the "strongest evidence," the court found, was the history of the federal tools-of-the-trade exemption. As the court explained, "[s]tates have long granted an exemption for tools or implements of the trade, and in interpreting these exemptions state courts have generally distinguished between personal hand tools of modest value, on the one hand, and machinery on the other." *Id.* at 1146-47. And, the court added, "[t]here is no indication that Congress, by taking over a familiar term from state law as the basis for a modest federal exemption that would be an alternative to the state exemptions . . . meant to expand it." *Id.* at 1147. After all, "[i]f Congress had . . . such an intention, it probably would not have imposed a $750 ceiling—for what, to repeat, could be the purpose of allowing a farmer to exempt a tiny fraction of the value of a piece of heavy farm machinery or of a herd of cattle?" *Id.* "Few farmers [would] be able to use the wild-card exemption to jack this figure up." *Id.*

In view of this history, alongside the statutory text, the court held that neither the debtors' tractor nor their cows were tools of the trade for purposes of § 522(d)(6):

---

[14] *See also Metzig v. Bank of the West (In re Metzig)*, 33 B.R. 620, 622 (Bankr. N.D. Tex. 1983) ("Arguably, Congress, by providing a specific exemption in tools of trade to the aggregate value of $750.00, was seeking to preserve to an automobile mechanic, a plumber, or some other tradesman who possessed only a nominal amount of tools a means to continue his livelihood.").

> To regard cows and other livestock as "tools" or "implements" does particular violence to the English language, and there is no indication that the terms are being used in a technical sense. There would be no semantic violence in regarding the [debtors'] tractor as a tool of the farming trade . . . but, while the question is a close one, we think the tractor is no more a tool of the trade in the statutory sense than the cow is. The tractor is not a modest implement but an expensive piece of machinery. It is one of the principal capital assets of a small farm. To exempt it would be like exempting the airplanes owned by an air charter service. This can't have been what Congress had in mind in allowing an exemption limited to $750. The relevant tools of the trade are the rakes and other hand tools that [one joint debtor] continues to own, and to use as a dairy hand following the bankruptcy.

*Id.* Because the debtors could not claim the tools-of-the-trade exemption, the court found that the bankruptcy court should have denied their motion to avoid the bank's lien, and it remanded the case for further proceedings. *Id.* at 1148.

*Patterson*, of course, is not binding on this Court, for three reasons. First, *Patterson* arose in a different jurisdiction—the Seventh Circuit is not the Eleventh Circuit. Indeed, many bankruptcy courts outside the Seventh Circuit permit debtors to exempt motor vehicles as tools of the trade.[15] Second, the court in *Patterson* was

---

[15] *See, e.g., Nazarene Fed. Credit Union v. McNutt (In re McNutt)*, 87 B.R. 84, 86-87 (B.A.P. 9th Cir. 1988) (rejecting *Patterson*'s "all or nothing approach" because "trades and uses of implements change and evolve; prior definitions and concepts should be consistent with changes in technology and trades"). *Cf. Parrotte v. Sensenich (In re Parrotte)*, 22 F.3d 472, 475-77 (2d Cir. 1994) (permitting Chapter 12 debtors to exempt cattle as tools of the trade under Vermont law); *Heape v. Citadel Bank of Independence (In re Heape)*, 886 F.2d 280, 283-84 (10th Cir. 1989) (permitting Chapter 7 debtors, both farmers, to avoid lien on livestock as tools of the trade under § 522(f)). The Debtor in this case relies on *Credithrift of America, Inc. v. Dubrock (In re Dubrock)*, 5 B.R. 353 (Bankr. W.D. Ky. 1980), where a Kentucky bankruptcy court granted the debtor's motion to

interpreting the federal exemption in § 522(d)(6), whereas this Court must interpret the Georgia exemption in O.C.G.A. § 44-13-100(a)(7). And third, this case involves a BMW, not a tractor and cows. But *Patterson*, by highlighting the symbiotic relationship between § 522(d)(6) and the state-level exemptions for tools of the trade, provides a clue that the Court should look deeper into the history of Georgia's exemption statute.

D. <u>Under Georgia's Early Exemption Statutes, Tools of the Trade were Limited to Small, Handheld Instruments</u>

The modern Georgia exemption for "implements, professional books, or tools of the trade" has antecedents dating at least as far back as 1822. In that year, the General Assembly passed an act "[t]o exempt from sale for debts contracted after a given time, certain articles chiefly necessary for the subsistence of the [debtor's] family," proclaiming in the prefatory clause that "it does not comport with justice or expediency to deprive innocent and helpless women and children of the means of

---

avoid a lien on his automobile, claiming it as an exempt tool of the trade. (Section 522(f) does not explicitly allow debtors to avoid liens on motor vehicles, so debtors sometimes try to do so by claiming the vehicle as a tool of the trade.) The debtor was a realtor, and the court held that the automobile was a tool of his trade because "[a] salesman of real estate must have constant and immediate access to reliable transportation, for not only himself but his clients." *Id.* at 354-55. No bankruptcy court in Georgia has squarely addressed a realtor's ability to exempt a motor vehicle, but *Schneider*, in permitting a traveling salesman to exempt his car, cited *Dubrock* approvingly. *See Schneider*, 37 B.R. at 751. Like *Patterson*, *Dubrock* is not binding on this Court.

subsistence."[16] The act permitted a debtor to exempt the following items: "[t]wo beds and bedding, common bedsteads, a spinning wheel and two pair of cards, a loom, and cow and calf, *common tools of his trade* and ordinary cooking utensils, and ten dollars['] worth of provisions."[17]

In *Lenoir v. Weeks*, 20 Ga. 596 (1856), the Supreme Court of Georgia interpreted the meaning of "common tools of [] trade" under the 1822 act. In that case, an attorney sought to exempt his law library from levy and sale, but the superior court denied his claimed exemption. On appeal, the Supreme Court of Georgia affirmed, explaining as following:

> The word tool is defined to be some simple instrument used by the hand, and the object of the Legislature obviously was, to exempt articles of small value and of frequent and daily use by a poor mechanic, upon whose manual occupation of these tools his family depended for a subsistence. It was never intended that the debtor should be protected in carrying on an extensive trade with a large capital, even in tools, while his creditor was suffering for the money justly due him.

> What [are] the other articles protected by the Act? Two beds and bedding, common bedsteads, a spinning wheel and two pair of cards, a loom and a cow and calf, common tools of his trade and ordinary cooking utensils. Did the Legislature intend to depart so far from the strict and appropriate meaning of the term []"common tools," as to extend it to all the utensils of a distillery, the looms,

---

[16] *See* Acts of the General Assembly of the [S]tate of Georgia, passed at milledgevilee [sic], at an annual session, in November and December, 1822 [volume 1], https://dlg.usg.edu/record/dlg_zlgl_5654590#text (last accessed May 27, 2025).

[17] *Supra* n. 16 (emphasis added).

22

> spindles, &c. of a cotton or woollen factory, the forges and
> other instruments of a manufactory of iron, and other
> complicated and expensive machinery, costing thousands
> of dollars? No such construction can be adopted without
> doing violence to the meaning of the Act.

*Lenoir*, 20 Ga. at 597. The court was thus "entirely satisfied that a lawyer's library"

did not fall within the meaning of "common tools of trade, within the true intent of

the [1822] Act." *Id.*

Georgia codified its tools-of-the-trade exemption in 1860. On December 9,

1858, the General Assembly provided for the election of three commissioners "to

prepare for the people of Georgia a Code, which should, as near as practicable,

embrace in a condensed form the laws of Georgia, whether derived from the

common law, the Constitution, the statutes of the state, the decisions of the Supreme

Court, or the statutes of England, of force in this state." *Wilensky v. Central of Ga.

Ry. Co.*, 136 Ga. 889, 72 S.E. 418, 419 (1911).[18] The resulting Code, prepared by

Richard H. Clark, Thomas R.R. Cobb, and David Irwin, was adopted by the General

Assembly in 1860 and went into effect in 1863. *Id.*[19] Its exemption statute provided

as follows:

---

[18] *See* Acts of the General Assembly of the [S]tate of Georgia, passed in Milledgeville, at an
annual session in November and December, 1858 [volume 1],
https://dlg.usg.edu/record/dlg_zlgl_32632919#text (last visited May 27, 2025).

[19] *See* University of Georgia School of Law, Digital Commons, A Service of the UGA Law
Library, 1860 Code, Preface & Contents, https://digitalcommons.law.uga.edu/ga_code/18/ (last
visited May 27, 2025).

The following property of every debtor, who is the head of a family, shall be exempt from levy and sale by virtue of any process whatever, under the laws of this State; nor shall any valid lien be created thereon, except in the manner hereinafter pointed out, but shall remain for the use and benefit of the family of the debtor:

1. Fifty acres of land, and five additional acres for each of his or her children under the age of sixteen years. This land shall include the dwelling-house, if the value of such house and improvements does not exceed the sum of two hundred dollars; Provided, that none of the above land be within the limits of a city, town, or village, and does not include any cotton or wool factory, saw or grist mill, or any other machinery propelled by water or steam, the value of which exceeds the sum of two hundred dollars; And provided, also, that such land shall not derive its chief value from other cause than its adaptation to agricultural purposes; or, in [lieu] of the above land, real estate in a city, town, or village, not exceeding five hundred dollars in value.

2. One farm horse or mule.

3. One cow and calf.

4. Ten head of hogs and fifty dollars' worth of provisions, and five dollars' worth additional for each child.

5. Beds, bedding, and common bedsteads sufficient for the family.

6. One loom, one spinning-wheel, and two pairs of cards, and one hundred pounds of lint cotton.

7. *Common tools of trade of himself and his wife.*

8. Equipment and arms of a militia soldier, and trooper's horse.

24

9. Ordinary cooking utensils and table crockery.

10. Wearing apparel of himself and family.

11. Family Bible, religious works, and school books.

12. Family portraits.

13. The library of a professional man, in actual practice or business, not exceeding three hundred dollars in value, and to be selected by himself.[20]

The Code of the State of Georgia, Part II ("The Civil Code"), Title 3 ("Of Relations Arising from Other Contracts"), Chapter 2 ("Of Debtor and Creditor"), Article 4 ("Insolvent Debtors"), Section III ("Property Exempt from Sale"), § 2013 (emphasis added).[21] The seventh listed exemption permitted an insolvent debtor to exempt from levy and sale any "common tools of trade of himself and his wife."

In *Kirksey v. Rowe*, 114 Ga. 893, 40 S.E. 990 (1902), the Supreme Court of Georgia was again called upon to interpret the meaning of the tools-of-the-trade exemption. At that time, the exemption was codified at § 2866 of the revised Code adopted December 15, 1895, but its language was identical to that in the 1860

---

[20] Evidently the General Assembly was unhappy with the *Lenoir* decision holding law books non-exemptible.

[21] *See* University of Georgia School of Law, Digital Commons, A Service of the UGA Law Library, 1860 Code, Pt. 2. Titles 1-5 (Pages 316-444), https://digitalcommons.law.uga.edu/ga_code/18/ (last visited May 27, 2025).

Code.[22] In *Kirksey*, the debtor sought to exempt a horse not used on a farm, a half-interest in a two-horse wagon, and a "set of harness." *Id.* at 990. The superior court denied all three exemptions. On appeal, the Supreme Court of Georgia affirmed in part and reversed in part. The court reversed as to the horse—permitting the exemption[23]—but affirmed as to the half-interest in the two-horse wagon[24] and as to the harness.

Pertinent to the matter now before this Court, the court held that "a set of harness, whether double or single, does not fall within the descriptive words 'common tools of trade.'" *Id.* Citing several legal dictionaries, the court explained that "the usual meaning of the word 'tool' is 'an instrument of manual operation'; that is, an instrument to be used and managed by the hand, instead of being moved

---

[22] *See* University of Georgia School of Law, Digital Commons, A Service of the UGA Law Library, 1895 Code Vol. 2, Civil Code. Titles 3-4 (Pages 221-502), https://digitalcommons.law.uga.edu/ga_code/28/ (last visited May 27, 2025).

[23] Although the exemption statute permits a debtor to exempt a "farm horse," the court interpreted that term to "apply to quality, and restrict value," not to "prescrib[e] the kind of work in which the exemption was to be employed." *Kirksey*, 40 S.E. at 990. The court held that "[c]ertainly a horse used in drawing a dray, and not worth over $40, may properly be regarded as coming within the descriptive term 'farm horse,' notwithstanding his actual employment may be urban rather than rural in character." *Id.*

[24] Section 2866(5) of the 1895 Code permitted a debtor to exempt "one one-horse wagon[.]" The Supreme Court of Georgia agreed with the superior court that "a half interest in a two-horse wagon cannot be exempted as 'one one-horse wagon'" because "[n]o amount of reasoning can alter the fact that a half interest in a two-horse wagon is not 'one one-horse wagon,' nor, indeed, a wagon of any kind." *Kirksey*, 40 S.E. at 990.

and controlled by machinery." *Id.* In other words, a tool is "[a]n implement used by the hand in working" or "[a] hand instrument necessary to one's trade." *Id.*

According to the court, one legal dictionary "cite[d] a number of cases in which such articles as sewing machines, pianos, violins, cornets, guns, etc., have been held to be tools, within the meaning of exemption statutes[.]" *Id.* But in the court's view, "[s]ome of [those] decisions evidently [went] further than [the Georgia exemption] statute would authorize in classifying as tools articles which are more properly designated as appliances or machines." *Id.* In Georgia, the court explained, "the word 'tool' was intended to have a more restricted interpretation," as evidenced by the statute's specific exemptions for "looms, spinning wheels, cotton cards, and sewing machines[.]" *Id.* The Court also quoted *Lenoir* at length in support of its holding that the harness was not exemptible as a common tool of the trade. *Id.* at 991.

In *Burt v. Stocks Coal Co.*, 119 Ga. 629, 46 S.E. 828 (1904), the Supreme Court of Georgia for the third time addressed the tools-of-the-trade exemption. There, the debtor, a dentist, sought to exempt his dentist's chair. The superior court denied the exemption, and the Supreme Court affirmed, citing *Lenoir* and *Kirksey* for the proposition that the exemption for common tools of trade "has uniformly been construed to refer, not to tools in common use by the debtor, regardless of their

27

value, but to those simple and inexpensive appliances used in his trade." *Burt*, 46 S.E. at 829.

In 1933, Georgia adopted a new code, The Code of Georgia of 1933, which largely replicated the exemptions established in 1860, with three notable changes having been made in the interim. First, by 1933 a debtor's total exemptions were capped at $1,600.00 in value.[25] Second, by 1933 a debtor could exempt "[f]ifty bushels of corn, 1,000 pounds of fodder, one one-horse wagon, one table and a set of chairs sufficient for the use of the family, and household and kitchen furniture not to exceed $150 in value."[26] Third, a debtor could exempt "[o]ne family sewing machine; this exemption to exist whether [the] person owning said machine is the head of a family or not, and to be good against all debts except for the purchase

---

[25] *See* The Code of Georgia of 1933, Title 51 ("Homestead and Exemptions"), Part I ("Constitutional Homestead"), Chapter 51-1 ("Exemptions Allowed and to Whom Granted"), § 51-101 ("What is exempt, and who may claim exemption") ("There shall be exempt from levy and sale . . . the property of every head of a family . . . realty or personalty, or both, to the value in the aggregate of $1,600[.]"), available at University of Georgia School of Law, Digital Commons, A Service of the UGA Law Library, 1933 Code, Titles 40-53 (Pages 1192-1419), https://digitalcommons.law.uga.edu/ga_code/32/ (last visited May 30, 2025).

[26] *See* The Code of Georgia of 1933, Title 51 ("Homestead and Exemptions"), Part II ("Statutory or Short Homestead"), Chapter 51-13 ("Property Exempted from Sale"), § 51-1301 ("Exempt items enumerated"), available at University of Georgia School of Law, Digital Commons, A Service of the UGA Law Library, 1933 Code, Titles 40-53 (Pages 1192-1419), https://digitalcommons.law.uga.edu/ga_code/32/ (last visited May 30, 2025).

28

money."[27] The exemption for a debtor's "common tools of trade of himself and wife" remained unchanged.[28]

Georgia passed its modern exemption scheme in 1980, two years after Congress passed the Bankruptcy Reform Act of 1978, Pub. L. 95-598. The General Assembly found that the 1978 bankruptcy reforms had "significant ramifications for Georgia debtors and creditors," particularly "the option . . . for states to elect between allowing Georgia debtors to claim the property exemptions authorized by the federal law and state law exemptions," and for that reason it was necessary "provide temporarily reasonable property exemptions for bankruptcy purposes" pending further study by the General Assembly.[29] The Governor of Georgia signed the legislation on March 24, 1980. *Matter of Boozer*, 4 B.R. 524, 526 (Bankr. N.D. Ga. 1980) (Robinson, J.). Codified at Georgia Code Annotated § 51-1301.1,[30] the

---

[27] *See supra* n. 26.

[28] *See supra* n. 26.

[29] *See* Acts and resolutions of the General Assembly of the [S]tate of Georgia 1980 [volume 1], https://dlg.usg.edu/record/dlg_zlgl_406881155#text (last visited May 27, 2025).

[30] Technically, the 1980 legislation left intact the 1933 exemptions then codified at Georgia Code Annotated § 51-1301 and simply added the new exemption scheme as an alternative at § 51-1301.1. *See supra* n. 29 ("Code Title 51, relating to homesteads and exemptions, as amended, is hereby amended by adding following Code Section 51-1301 a new Code section to be designated Code Section 51-1301.1 to read as follows: 51-1301.1. Alternative exemption. In lieu of the exemption provided in Code Sections 51-1301 or 51-101, any debtor who is a natural person may exempt, pursuant to this chapter, for purposes of bankruptcy, the following property . . . ."). The 1980 exemptions were originally due to sunset on July 1, 1981. *Id.* ("Code Sections 51-1301.1 and 51-1601, added by this Act, and this Act shall stand repealed in their entirety effective July 1, 1981.").

29

exemption statute initially permitted, as relevant here, an $800.00 motor vehicle exemption and a $500.00 exemption in "any implements, professional books, or tools of the trade of the debtor or the trade of a dependent of the debtor[.]"[31] Eventually, the exemptions enacted in 1980 became permanent and were codified at O.C.G.A § 44-13-100; the tools-of-the-trade exemption has been amended only as to its dollar amount.

E. The General Assembly Did Not Materially Change the Meaning of the Tools-of-the-Trade Exemption when it Enacted the Modern Georgia Exemption Statute

What lessons can be drawn from this statutory history? Most obviously, *Lenoir*, *Kirksey*, and *Burt* all stand for the proposition that a "common tool of the trade," for purposes of the early Georgia exemption statutes, had to be a small, handheld instrument—or, at least, a "simple and inexpensive appliance," as *Burt* put it. Taken at face value, then, those three Supreme Court of Georgia decisions suggest that, at least under the old exemption statutes, motor vehicles would not have been considered tools of the trade because they were not small, handheld, simple, or inexpensive.

But perhaps those cases shouldn't be taken at face value. It is a striking fact that the early exemption statutes surveyed here for the most part *lacked dollar limits*.

---

[31] *Supra* n. 29.

The 1822 act mentioned only a single dollar amount ($10.00 worth of provisions), and the 1860 Code had only four such limitations ($200.00 for improvements to real property or $500.00 for real estate in an urban area, $50.00 worth of provisions, $5.00 worth of provisions for each child, and up to $300.00 in a professional's library). Absent any dollar limitation on "common tools of the trade," it makes sense that the Supreme Court of Georgia restricted that phrase to mean only small, handheld devices—otherwise, debtors might have sought to exempt heavy machinery used in factories, thereby thwarting creditors in a manner unforeseen by the General Assembly.

That caveat aside, a question arises as to whether the cases *Lenoir*, *Kirksey*, and *Burt* remain good—indeed, binding—law in Georgia. When the General Assembly enacted the modern exemption scheme in 1980, did it intend to ratify the Supreme Court of Georgia's definition of "common tools of the trade" set forth in those cases? Under the prior-construction canon, "[i]f a statute uses words or phrases that have already received authoritative construction by the jurisdiction's court of last resort . . . they are to be understood according to that construction." *Reading Law* at 322. *See also Lamar, Archer & Cofrin*, 584 U.S. at 721-22 (quoting *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998)) ("When . . . judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a

31

new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well[.]").

Here, where the early exemption statutes allowed a debtor to exempt "common tools of trade of himself and his wife," the modern statute uses the phrase "tools of the trade of the debtor[.]" Thus, the General Assembly deleted the adjective "common," added the article "the" before "trade," and dropped the gendered language "of himself and his wife." The Court finds these changes merely cosmetic, not substantive. In this respect the Court disagrees with the decision *South Atl. Prod. Credit Assoc. v. Jones (In re Jones)*, 87 B.R. 738 (Bankr. M.D. Ga. 1988) (Laney, J.). There, Judge Laney cited *Kirksey* and *Burt* but made much of the fact that the word "common" was deleted:

> . . . *Burt* is the most recent case on the meaning of "tools of the trade" from the Georgia state courts, and it was decided in 1904. The current Georgia statute does not contain the modifier "common" before "tools of the trade." Therefore, these cases are not necessarily indicative of the meaning of the current statute and no reported Georgia case has discussed the meaning of "tools of the trade" in said statute.

*Id.* at 742. Respectfully, the Court fails to see how the deletion of the word "common"—meaning "of or relating to a community at large"—materially changes the meaning of the phrase "tools of the trade." MERRIAM-WEBSTER DICTIONARY (online ed. 2025).

On balance, the Court finds that the General Assembly intended to ratify the holdings of *Lenoir*, *Kirksey*, and *Burt* when it passed the modern exemption statute in 1980. Those cases having been decided by this State's highest court, the legislature is presumed to have been on notice of them, yet it did not substantively change the exemption's language. Moreover, the General Assembly has amended the exemption statute no fewer than nine times since 1980.[32] And the split of

---

[32] In 1981, the exemption statute was amended to, among other things, delete the sunset provision for the 1980 exemptions. *See* Acts and resolutions of the General Assembly of the [S]tate of Georgia 1981 [volume 1], https://dlg.usg.edu/record/dlg_zlgl_416200087#text (last visited May 30, 2025) (The 1980 act "is hereby amended by striking in its entirety Section 4 of said Act, which reads as follows: Section 4. Code Sections 51-1301.1 and 51-1601, added by this Act, and this Act shall stand repealed in their entirety effective July 1, 1981."). In 1988, the statute, by that time codified at O.C.G.A. 44-13-100, was amended to add an exemption for undistributed public or nonprofit retirement or pension plan funds. *See* Acts and resolutions of the General Assembly of the [S]tate of Georgia 1988 [volume 1], https://dlg.usg.edu/record/dlg_zlgl_485432255#text (last visited May 30, 2025). A 1989 exemption made minor stylistic changes. *See* Acts and resolutions of the General Assembly of the [S]tate of Georgia 1989 [volume 1], https://dlg.usg.edu/record/dlg_zlgl_495388147#text (last visited May 30, 2025). In 1995, the statute was amended to create a broader exemption for individual retirement accounts. *See* Acts and resolutions of the General Assembly of the [S]tate of Georgia 1995 [volume 1], https://dlg.usg.edu/record/dlg_zlgl_563510980#text (last visited May 30, 2025). A 2001 amendment changed the amounts of certain exemptions "and the standards, practices, and procedures connected therewith[.]" Acts and resolutions of the General Assembly of the State of Georgia 2001, volume 1, https://dlg.usg.edu/record/dlg_ggpd_y-ga-bl407-b2001-bv-p1#text (last visited May 30, 2025). In 2012, the General Assembly increased the amount of the homestead exemption from $10,000.00 to $21,500.00 (where it remains). *See* Acts and resolutions of the General Assembly of the State of Georgia 2012 [2012], https://dlg.usg.edu/record/dlg_ggpd_y-ga-bl407-b2012-bv-p1-bbk-p2-belec-p-btext#text (last visited May 30, 2025). In 2013, the amount of the motor vehicle exemption was increased from $3,500.00 to $5,000.00 and to make a minor stylistic change. *See* Acts and resolutions of the General Assembly of the State of Georgia 2013: volume one [2013], https://dlg.usg.edu/record/dlg_ggpd_y-ga-bl407-b2013-bv-p1-belec-p-btext#text (last visited May 30, 2025). In 2015, the General Assembly increased the amount of the wildcard exemption. *See* Acts and resolutions of the first session of the 153rd General Assembly of the State of Georgia 2015: volume one, book two [2015], https://dlg.usg.edu/record/dlg_ggpd_y-ga-bl407-b2015-bv-p1-bb-p2-belec-p-btext#text (last visited May 30, 2025). And in 2017, the statute was amended to create an exemption for assets in health savings accounts. *See* Acts and resolutions of the first session of the 154th General

authority among bankruptcy courts on this issue dates to the early 1980s, when *Curry* and *Schneider* were decided. Yet at no point in the past 45 years has the legislature seen fit to change the language of the tools-of-the-trade exemption. The Court finds that the phrase "tools of the trade" in O.C.G.A. § 44-13-100(a)(7) must be interpreted in light of *Lenoir*, *Kirksey*, and *Burt*.

To be sure, the Court does *not* hold that the modern tools-of-the-trade exemption is limited to those items that would have been exemptible in, say, 1904, when *Burt* was decided. In that respect, the Court agrees with Judge Norton's analysis in *Schneider*:

> Within recent time no Georgia state court has interpreted "tool of the trade" in the exemption section. Many of the Georgia decisions were rendered prior to the more modern mechanical or technological age we now live in. We must recognize that trades and uses of implements may change and evolve, and prior definitions and concepts must be revised to be consistent with technological or trade changes and uses.

*Schneider*, 37 B.R. at 750-51. In other words, the exemption's scope can change with the passage of time and the advent of new technologies. No doubt many skilled workers today use tools undreamt of by legislators a century or more ago. We no

---

Assembly of the State of Georgia 2017: volume one, https://dlg.usg.edu/record/dlg_ggpd_y-ga-bl407-b2017-bv-p1-belec-p-btext#text (last visited May 30, 2025).

longer live in *Kirksey*'s world of two-horse wagons and harnesses. And not only have tools changed—the universe of trades has likewise grown.[33]

But it does not follow that a motor vehicle is a tool of the trade. Without attempting to define the precise contours of the tools-of-the-trade exemption, the Court finds that *Lenoir*, *Kirksey*, and *Burt* preclude a debtor from exempting a motor vehicle as a tool of the trade under O.C.G.A. § 44-13-100(a)(7). The Court agrees with *Curry* about the continuing validity of these Supreme Court of Georgia decisions:

> [I]n Georgia a tool of the trade is an implement used by a person in that person's work. Tools of the trade may be far more sophisticated today than they were when the Supreme Court of Georgia considered the question, but the term still contemplates that the person uses the tool with his hands, and that the person's work requires some degree of manual skill.

*Curry*, 18 B.R. at 359. This interpretation is only bolstered by the statute's grouping of tools of the trade with implements and professional books, by the separate motor vehicle exemption, and by the relatively low dollar amount of the tools-of-the-trade exemption. Bringing together these disparate threads, the Court finds that the Debtor

---

[33] Georgia requires a license to practice such professions as certified public accountancy, architecture, chiropractic, dentistry, professional engineering, land surveying, law, pharmacy, psychology, medicine and surgery, optometry, osteopathy, podiatry, veterinary medicine, registered professional nursing, and harbor piloting. O.C.G.A. §§ 14-7-2(2), 14-10-2(2), 43-1-24.

cannot exempt her BMW as a tool of her trade as a realtor under O.C.G.A. § 44-13-100(a)(7).

## IV. Conclusion

As mentioned, the Court fully accepts the Debtor's testimony that she cannot perform her job as a realtor without using a motor vehicle. If the Georgia exemption statute allowed a debtor to exempt a motor vehicle as a tool of the trade, then the Court would permit her to claim that exemption in this case. But the statute does not so allow. Consistent with this Opinion, the Court will, by separate order, sustain the Chapter 7 Trustee's Objection to Exemptions. (Dckt. 23).

Dated at Savannah, Georgia, this 4th day of June, 2025.

Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia